**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICHARD WEED<br><br>Defendant. | **Criminal No.  14-cr-10348-DPW** |

**GOVERNMENT'S MOTION *IN LIMINE*
TO ADMIT CERTAN EVIDENCE AT TRIAL REGARDING
COMPANIES NOT SPECIFICALLY IDENTIFIED IN THE INDICTMENT**

The government respectfully moves *in limine* to admit at trial evidence of the defendant's involvement with CC-1 and CC-2 in companies not specifically identified by name in the Indictment.  The evidence set forth below is intrinsic to and completes the story of the charged crimes, in particular the conspiracy charged in Count One.  Evidence of these and other acts is also admissible pursuant to Federal Rule of Evidence 404(b).

**BACKGROUND**

On December 4, 2014, the defendant, a licensed attorney, was charged in an 11 Count Indictment with securities fraud in violation of 18 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b5, and 18 U.S.C. § 2; wire fraud in violation of 18 U.S.C. §§ 1343, 1349, and 2; and conspiracy to commit securities fraud and wire fraud in violation of 18 U.S.C. § 371.  The charges arise out of the defendant's participation, with Co-Conspirator 1 ("CC-1") and Co-Conspirator 2

1

("CC-2") and others, in the manipulation of various publicly traded companies. Specifically, and as set forth further below, the charges are based on (1) Weed's participation with CC-1 and CC-2 in a series of market manipulations beginning in November 2008 and continuing through July 2011; and (2) his assistance, in 2013, to CC-1 and others with the manipulation of the stock of a company (Amogear, Inc.) that, unbeknownst to Weed, was actually controlled by the Federal Bureau of Investigation ("FBI").

The Indictment specifically identifies certain of the companies that were formed and manipulated beginning in 2008, in particular companies that were "reverse merged" into a shell company that Weed owned called GFY Foods, Inc. Indeed, in 2008, CC-1 bought that shell company from Weed and then, along with CC-2, proceeded to enlist Weed's assistance in reverse merging that same shell company into various different privately held companies. Between 2008 and 2011, that shell company was reformulated four times and was known as Upturn Inc., CitySide Tickets, Inc., Causeway, Inc., and United Bullion Exchange, Inc. ("UBEX") (collectively, the ("GFY Companies"). As set forth in more detail in the Government's Trial Brief, Weed's role was central to the conspiracy. He provided legal work to effectuate the mergers; served as an officer and/or director of the GFY Companies; and issued false and misleading opinion letters to the GFY Companies' transfer agent that enabled CC-1 and CC-2 to receive stock, which they then sold in connection with carefully orchestrated stock promotions designed to inflate the stock price.

At the same time that Weed was working with CC-1 and CC-2 to manipulate those companies, he also was assisting them with mergers concerning two other publicly traded companies—VizStar, Inc. and True 2 Beauty, Inc. Weed's role, as always, was to complete the necessary paperwork for CC-1 and CC-2, serve as an officer and director, and distribute stock to

nominees controlled by CC-1 and CC-2, including some of the same nominees that they used during the course of the manipulation of the GFY Companies.

By approximately July 2011, the manipulation of the GFY Companies, VizStar and True 2 Beauty had run their course. At the end of 2013, however, CC-1 went back to Weed again. This time, he asked for the defendant's assistance with yet another manipulation, specifically the manipulation of the shares of Amogear. Once again, the defendant provided CC-1 with false and misleading legal opinion letters that allowed CC-1 and his Amogear partners to obtain the majority of Amogear's free trading stock, without restriction. Weed agreed, and he issued the opinion letters.

By way of this Motion, the government seeks admission of evidence regarding Weed's dealings with CC-1 and CC-2 regarding VizStar and True 2 Beauty, which dealings took place at the same time as their dealings regarding the GFY Companies. Indeed, as set forth below, the dealings between CC-1, CC-2, and Weed regarding VizStar and True 2 Beauty are inextricably intertwined with their dealings regarding the GFY Companies in that they literally discussed them in the same telephone conversations and e-mail and text communications, and CC-1 and CC-2 paid Weed for his services related to all of the companies at the same time. As a result, the evidence regarding VizStar and True 2 Beauty is intrinsic to the conspiracy charged in Count One as well as the securities fraud charged in Count Two and the wire fraud charged in Counts Five through Nine, which relate to CitySide.

Moreover, as Weed was well aware, the same person (identified herein as R.B.) served as an officer of VizStar, UBEX, and Amogear. Therefore, evidence regarding VizStar also is

relevant to the Amogear scheme that forms the basis of the wire fraud charged in Counts Ten and Eleven.

Even if this evidence was not intrinsic to each of the substantive counts, however, it is admissible pursuant to Rule 404(b) as it goes very specifically to Weed's knowledge of CC-1's and CC-2's control over the "nominee" entities that held the majority of the shares of each of the publicly traded companies that they formed. Weed's knowledge in this regard will be a central issue in this case.

## THE EVIDENCE

The government seeks to introduce evidence concerning VizStar and True 2 Beauty through witnesses and documents, which testimony and exhibits also relate directly to the GFY Companies and/or Amogear. As a result, the introduction of evidence about VizStar and True 2 Beauty during the relevant period will not complicate, extend, or otherwise delay the trial. Moreover, the fact that the evidence is overlapping only further demonstrates that the evidence regarding VizStar and True 2 Beauty is intrinsic to the conspiracy, securities fraud and wire fraud charged in the Indictment. In addition to expected testimony of CC-1 and CC-2, and the potential testimony of R.B., the following are examples of documentary evidence that the government intends to offer as to the GFY Companies, VizStar, True 2 Beauty and Amogear:

*Recorded Calls*

During CC-1's cooperation with the FBI, he recorded telephone calls with Weed in which they discuss the manipulation of the GFY Companies and Amogear, which calls will be offered as evidence regarding those manipulations. In many of those same calls, CC-1 and Weed also discuss VizStar and/or True 2 Beauty.

*Email Correspondence*

Similarly, in email correspondence from the 2010 time period, Weed and CC-1 discuss Weed's involvement in CitySide, True 2 Beauty, and VizStar.  (See, for example, email correspondence dated January 22, 2010, attached hereto as Exhibit A, which concerns CitySide and True 2 Beauty, and email correspondence dated September 10, 2010, attached hereto as Exhibit B, which concerns True 2 Beauty, CitySide, and VizStar).[1]   Indeed, it makes sense that the two would discuss all of the companies in a single email exchange because Weed was assisting with the mergers, stock distributions, and related legal paperwork in all three companies at the same time.  These emails constitute critical evidence not just of Weed's general involvement in the scheme, but, in particular, his knowledge that CC-1 controlled the nominee entities holding shares in both companies.  For example, email correspondence dated February 23, 2010, and November 11, 2010, attached hereto as Exhibits C and D, between CC-1 and the defendant about True 2 Beauty states that "Trinity Alliance Ltd." held stock in True 2 Beauty, which nominee entity CC-1 also used to disguise his stock ownership in CitySide.  Additional email correspondence reflects the involvement of another individual who held stock on behalf of CC-1 and CC-2 in at least one of the GFY Companies as well as VizStar.

---

[1] The ticker symbol for CitySide was CIST; the ticker symbol for True 2 Beauty was TRTB; and the ticker symbol for VizStar was VIZS.  True 2 Beauty was previously known as Burrow Mining, Inc.

*Text Messages*

The government intends to introduce some text messages between Weed and CC-1 and CC-2, including a text message from the defendant to CC-2 in June 2014.  In that text, Weed warned CC-2 that CC-1 and R.B. may be cooperating with the FBI.

*Bank Record Analysis*

The government's summary witness will testify regarding, among other things, transfers of money between CC-1, CC-2 and Weed.  These transfers, especially the ones in 2010 and the beginning of 2011, will relate not only to the GFY Companies, but also to VizStar and True 2 Beauty since the three were working on all of those transactions at the same time.  (See, for example, email correspondence dated January 26, 2010, attached hereto as Exhibit F, in which the defendant emails CC-1 and CC-2 and summarizes his use of money on the "Burrow Mining Transaction" and "CitySide").

## LAW AND ARGUMENT

I. This Evidence of the Defendant's Other Acts is Admissible as Intrinsic to the Charged Crimes

For the reasons set forth below, evidence concerning VizStar and True 2 Beauty is admissible as intrinsic to, and necessary to complete the story of, the charged crimes.

A. Applicable Law

It is well-settled that evidence of other acts that are "intrinsic to the crime for which the defendant is on trial" is admissible without regard for the requirements of Federal Rule of Evidence 404(b).  United States v. Epstein, 426 F.3d 431, 439 (1st Cir. 2005) (citation and

internal quotation marks omitted). Moreover, "[i]ntrinsic evidence includes prior acts that are part of the necessary description of the events leading up to the crime or that go to an element of the charged offense." United States v. Souza, 749 F.3d 74, 84 (1st Cir. 2014) (internal quotations omitted); see United States v. Taylor, 284 F.3d 95, 101 (1st Cir. 2002) (affirming admission of reference to defendant's prior drug transaction on consensual recording with cooperating witness "as part and parcel of an on-going conversation taking place during the crime itself," and citing United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994), for the proposition that "Rule 404(b) is not applicable to evidence of crimes that are necessary to complete the story of the charged crime").

    B. <u>Analysis</u>

The jury should be permitted to hear the entirety of the dealings between CC-1, CC-2 and Weed as it is "part and parcel of an on-going conversation taking place." See Taylor, 284 F.3d at 101. Indeed, as set forth above, in their email exchanges and in the subsequent recorded conversations between CC-1 and the defendant, the two discuss CitySide at the same time they discuss VizStar and/or True 2 Beauty.

For example, during a consensually recorded telephone call on November 9, 2012, CC-1 and the defendant engaged in the following exchange, which shows that their conversations about VizStar and True 2 Beauty are inextricably intertwined with evidence concerning CitySide:

**Defendant**: We've learned a lot from our experiences over the years . . .

**CC-1**: The three or four that we've done, um, whether it by CitySide or VizStar or True 2 Beauty . . . I hadn't taken salary in six months . . .

> **Defendant**: Yeah, yeah, no, and I think that discipline just has to be - - look, no new money for accumulated stuff.[2]

Similarly, as noted above, there is email correspondence between CC-1 and the defendant in which CitySide, VizStar, and/or True 2 Beauty are discussed. As with the aforementioned recordings, the entire content of the emails should be admitted into evidence because the conversations about VizStar and True 2 Beauty are part and parcel of the on-ongoing dialogue about CitySide.

In addition, email correspondence about VizStar and/or True 2 Beauty is relevant to the defendant's knowledge of, among other things, the nominee entities through which CC-1 held CitySide stock. As set forth above and explained further in the Government's Trial Brief, as part of their efforts to conceal and disguise their control over the stock, CC-1 and Weed directed that the free-trading shares obtained pursuant to Weed's opinion letters be distributed to nominee entities (and some people) controlled by CC-1 and CC-2. The government expects Weed to argue that he was unaware that CC-1 and CC-2 controlled these various nominees. But the fact that CC-1 and Weed discussed distributing shares to the same nominees for different transactions belies that assertion. This type of evidence regarding VizStar and/or True 2 Beauty thus is directly relevant and intrinsic to the charged crime, which involved the defendant knowingly providing false and misleading opinion letters to transfer agents about certain nominee entities controlled by CC-1. See Souza, 749 F.3d at 84 ("[i]ntrinsic evidence includes prior acts . . . that go to an element of the charged offense".)

The other evidence involving VizStar and True 2 Beauty, which necessarily overlaps with

---

[2] Quotations herein are based on draft, not final, transcripts.

evidence involving the GFY Companies and Amogear, is, likewise intrinsic to the charges in the Indictment. For example, as set forth above, in June 2014, Weed sent CC-2 a text message warning that CC-1 and R.B. may be cooperating with the FBI. This text message demonstrates the defendant's consciousness of guilt (why would he be concerned about CC-1 and R.B. cooperating with the FBI if he and CC-2 had done nothing wrong), but it makes much more sense if the jury understands R.B.'s role in VizStar as well as the other entities. More importantly, the fact that Weed knew that R.B. was associated with CC-1 in two other entities is highly relevant to establishing that Weed also understood that CC-1 "controlled" Amogear. Indeed, Weed's involvement was less extensive in Amogear than it had been in the other companies. His knowledge of CC-1's control over Amogear will be a central issue and R.B.'s overlapping involvement will be important to establishing Weed's knowledge.

Likewise, the bank records showing multiple wire transfers back and forth and between Weed, CC-1 and CC-2 in 2010 and 2011 will be overlapping—some will necessarily relate to CitySide, Causeway and UBEX, while others will relate to VizStar and True 2 Beauty. Indeed, because of the overlapping timeframe, CC-1 and CC-2 likely paid Weed for his services in connection with the multiple companies in a single wire transfer. The evidence of VizStar and True 2 Beauty is relevant to the extent of the relationship between CC-1, CC-2, and Weed and thus goes to Weed's knowledge of the manipulation of all of these companies.

CC-1, CC-2, and R.B. should be allowed to discuss the entirety of their dealings with Weed, which includes VizStar and True 2 Beauty, because they were doing the deals at the same and they necessarily discussed them together. To try to exclude discussion of VizStar and True 2 Beauty would tell an incomplete story and, in some instances, be confusing for the jury because

9

the co-conspirators treated and discussed them together. The evidence of VizStar and True 2 Beauty is "part and parcel" of the manipulations charged in the Indictment and should be admitted as intrinsic to the charges.

II.  The Other Acts Evidence is Admissible Pursuant to Fed. R. Evid. 404(b)

The other act evidence set forth above concerning the defendant is also admissible pursuant to Federal Rule of Evidence 404(b) to explain the background and development of the relationships among them, as well as their motive, intent, knowledge, and consciousness of guilt.

A. Applicable Law

Uncharged crimes or "other" acts evidence is admissible pursuant to Rule 404(b) if relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake of accident. See United States v. Green, 698 F. 3d 48, 55 (1st Cir. 2012). Rule 404(b) evidence is only admissible if, under Rule 403, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Id.

The First Circuit has established a two-part test for the admission of other acts evidence under Rule 404(b). First, the trial court must determine whether the proffered evidence "is relevant to any purpose other than to prove that a defendant has a propensity to commit a crime." United States v. Rodriguez-Berrios, 573 F.3d 55, 64 (1st Cir. 2009) (citing United States v. Aguilar-Aranceta, 58 F.3d 796, 798 (1st Cir. 1995)). Second, the court must determine, pursuant to Rule 403, "whether the probative value of the evidence is substantially outweighed by its danger of unfair prejudice." Id. In addition, the court "should, if requested to do so be defense counsel, issue a limiting instruction to the jury concerning the purpose of such evidence in order to further reduce the potential for prejudice flowing from its admission." United States v. Escobar-de Jesus,

187 F.3d 148, 170 n.20 (1st Cir. 1999); see also United States v. Santana, 342 F.3d 60, 67 (1st Cir. 2003) (citing United States v. Vest, 842 F.2d 1319, 1327 (1st Cir. 1988), for the proposition that "prejudicial effect can be reduced by issuing an appropriate limiting instruction.")

The First Circuit has emphasized that Rule 404(b) "is not exclusionary," but "permits the introduction of uncharged bad act evidence if the evidence is relevant for purposes other than proof of a defendant's bad character or criminal propensity, subject only to the limitations of Rule 403." Id. at 169 (citations omitted). For example, although some of the permissible uses of uncharged crimes evidence are enumerated in Rule 404(b) itself, that list is non-exhaustive. See United States v. Nicoli, 237 F.3d 8, 15 (1st Cir. 2001). In particular, the First Circuit routinely has sanctioned the government's use of such evidence as a means of providing the jury with background information as to the charged crimes, an explanation of the development of criminal relationships and an illustration of the mutual trust that existed between coconspirators. United States v. Green, 698 F.3d 48, 55 (1st Cir. 2012) ("in a conspiracy case, 'evidence of other bad acts . . . can be admitted to explain the background, formation, and development of the illegal relationship, and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust.'") (quoting Escobar-de Jesus, 187 F.3d at 169); Santana, 342 F.3d at 67 (same). Similarly, such evidence is admissible as proof of consciousness of guilt. See, e.g., United States v. Levy-Cordero, 67 F.3d 1002 (1st Cir. 2005) (evidence that defendant, upon learning that he was about to be arrested, attempted to flee while carrying a false passport, a false Social Security card and other documents, was "properly admissible under Rule 404(b) to show consciousness of guilt").

B. <u>Analysis</u>

Here, the government intends to offer evidence of the defendant's involvement in VizStar and True 2 Beauty not to show propensity, but rather as relevant background to explain an ongoing criminal relationship and the relationship of mutual trust among the defendant and CC-1 and CC-2. The evidence also explains the defendant's motive, intent, knowledge and absence of mistake or accident.

As discussed above, evidence of the business dealings between the defendant and CC-1 and CC-2 during 2008 through 2011 in VizStar and True2Beuaty provide probative evidence of their criminal relationship and the defendant's knowledge of the charged crimes. As discussed above, CC-1 used the same nominee in True 2 Beauty as he did in CitySide to disguise his stock ownership; CC-1, through another individual, used offshore nominee accounts to hold and trade stock in both CitySide and VizStar; and R.B. served as an officer of CitySide, VizStar, and Amogear. All of this evidence is highly relevant of the defendant's relationship with the parties involved in these matters and knowledge of the underlying criminal conduct charged in the Indictment.

Evidence about VizStar and True 2 Beauty is also relevant to the defendant's intent and motivation. Indeed, the defendant sent an email, which is attached hereto as Exhibit E, about a True 2 Beauty deal to CC-1 and CC-2 on September 25, 2010, and wrote: "This deal is out the door right before your bedtime. Talk to you Monday. Long day, here. Let's go earn some money." The defendant, like CC-1 and CC-2, was motivated to make money through these business deals.

Moreover, the "other acts" evidence is not unfairly prejudicial. Relative to the lengthy consensual recordings in which the defendant can be heard engaging in the charged crimes, along with the testimony of CC-1, CC-2, and others, including an undercover FBI agent—all of which will form the bulk of the government's case-in-chief—the other acts evidence is expected to form "only a tiny fraction of the testimony heard by the jury." United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990). Evidence regarding VizStar and True 2 Beauty will come in through the same witnesses whom the government already intends to call to testify and is from the same documents and recordings in which the co-conspirators discuss CitySide and Amogear. Moreover, none of that evidence involves conduct that is "unduly inflammatory." United States v. Van Horn, 277 F.3d 48, 48 (1st Cir. 2002). Cf. Roldan-Zapata, 916 F.2d at 804 (in prosecution for conspiracy to distribute drugs, evidence of defendant's prior drug dealing with co-conspirator was not unduly prejudicial insofar as it "did not involve conduct any more sensational or disturbing than the crimes" charged). Indeed, aside from the differently named companies, the evidence concerning VizStar and True 2 Beauty will essentially be the same evidence that the jury will already hear regarding the GFY Companies because the defendant's involvement along with CC-1 and CC-2 in each company followed a common pattern. Therefore, given the highly probative value of the evidence here, any prejudicial impact is, by comparison, insufficient to justify its exclusion. Moreover, any such prejudice can be mitigated by a cautionary instruction that limits the jury's consideration of other acts evidence to the specific purposes for which it is admitted. See Escobar-de Jesus, 187 F.3d at 170 n.20; Santana, 342 F.3d at 67; Vest, 842 F.2d at 1327.

13

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court admit at trial evidence of the above-described acts of the defendant.

>Respectfully submitted,
>
>CARMEN M. ORTIZ
>United States Attorney
>
>By: /s/ Eric A. Forni
>ERIC A. FORNI
>Special Assistant U.S. Attorney
>SARAH E. WALTERS
>Assistant U.S. Attorney

Dated: April 11, 2016

## CERTIFICATE OF SERVICE

I, Eric A. Forni, hereby certify that on April 11, 2016, I served a copy of the foregoing by electronic filing on counsel for the defendant.

>/s/ Eric A. Forni
>ERIC A. FORNI