United States District Court
District of Massachusetts

```
                           )
UNITED STATES OF AMERICA,  )
                           )
            v.             )
                           )   Criminal Action No.
RICHARD WEED,              )   14-10348-NMG
                           )
            Defendant.     )
                           )
```

MEMORANDUM & ORDER

GORTON, J.

In this case, Richard Weed ("Weed" or "petitioner")
challenges the constitutionality of his 2016 conviction on
multiple fraud counts.  Weed alleges that the government
unlawfully suppressed evidence of criminal acts committed by his
co-conspirator, Coleman Flaherty ("Flaherty"), during the course
of Flaherty's cooperation with the government.  He also claims
he was afforded ineffective assistance of counsel.

Pending before the Court is petitioner's motion to vacate
pursuant to 28 U.S.C. § 2255 (Docket No. 251) and his motion for
related discovery (Docket No. 254).  For the reasons that
follow, both motions will be denied.

-1-

I.    **Background**

A.    **Facts**

In December, 2014, Weed was indicted on one count of securities and wire fraud conspiracy, in violation of 18 U.S.C. § 371, one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78(ff), and nine counts of wire fraud, in violation of 18 U.S.C. § 1343.  The charges arose from a conspiracy in which Weed worked with Flaherty and another Boston-based stock promoter, Thomas Brazil ("Brazil"), to manipulate the stock price of multiple publicly traded companies sold on the over-the-counter ("OTC") securities markets.  The conspiracy and the respective roles of Weed and Flaherty are discussed in greater detail in the decision of the First Circuit Court of Appeals ("First Circuit") affirming Weed's conviction. United States v. Weed, 873 F.3d 68 (2017).

Weed opted to proceed to trial in 2016, during which Flaherty testified for the government.  After an 11-day trial, a jury found Weed guilty on all counts.

Flaherty had been cooperating with the government for several years prior to Weed's trial.  In April, 2012, special agents with the Federal Bureau of Investigation ("FBI") confronted Flaherty with evidence of his guilt in multiple fraud

schemes.  The following day, Flaherty agreed to cooperate with the government.

In December, 2014, Flaherty pled guilty to a three-count information charging conspiracy, securities fraud and wire fraud.  United States v. Flaherty, No. 1:14-cr-10330-PBS-1.  In June, 2016, two months after Weed's trial, Flaherty was sentenced to 12 months home confinement and a $100,000 fine.  In justifying its recommendation for such a lenient, below-guideline sentence, the government described Flaherty's level of cooperation as "extraordinary."  It explained that over the course of his cooperation, Flaherty had recorded over 5,000 phone calls and text conversations, ultimately supporting the convictions of several individuals for market manipulation-related crimes in this district.

One of the other cases in which Flaherty served as a cooperating witness was United States v. Withrow, No. 1:15-cr-10261-PBS, which charged defendants Edward Withrow, III ("Withrow") and Marco Babini ("Babini") with fraud, conspiracy and false statements.  In December, 2017, more than one year after testifying against Weed, Flaherty once again served as a witness for the government, this time in Withrow's trial.

The cross-examination of Flaherty by Withrow's attorney was the impetus for the instant petition.  During his cross-

examination, Flaherty was impeached on two matters that took place over the course of his cooperation with the government: the adoption of a child from Montana by him and his wife and his filing of inaccurate tax returns.  The details of each of those matters, including the discovery produced relating to each, and how counsel for defendants Weed and Withrow handled them on cross-examination are as follows:

### 1.   Adoption

In May, 2013, Flaherty and his wife adopted a child from a family in Montana.  At some point between April, 2012 (the start Flaherty's cooperation with the government) and May, 2013 (when the adoption process was complete), the FBI recorded a phone call between Flaherty and Babini ("the Flaherty-Babini call"). During that telephone conversation, Flaherty relayed to Babini the gist of a prior conversation Flaherty had with the biological father of his adoptive child.  Flaherty recalled that the biological father had indicated that he and his wife could not afford another child and asked Flaherty to "take good care of his daughter."

The government produced the recording of the Flaherty-Babini call to counsel for Withrow in the course of discovery. The government did not produce the recording to Weed's counsel but did produce other materials indicating that Flaherty had

adopted a child during the course of his cooperation with the government.

During Weed's trial, defense attorney J.W. Carney cross-examined Flaherty on the adoption as follows:

Q: What do you hope your sentence will be?

A: I don't have anything in particular in mind.

. . .

Q: Are you hoping for probation?

A: If you're asking me if I want to go to prison, I'm hoping I don't.

Q: You testified that you have a daughter now?

A: Yes.

. . .

Q: Are you like most fathers and want to be with her?

A: Sure.

Q: Are you going to do everything you can to get the lowest sentence you can?

A: I'm just going to abide by the – what I had agreed to do in my plea agreement. . . .

Q: Did you know that you might go away for five years?

A: Yes.

Q: At the time you adopted a little girl?

A: Yes.

Q: Isn't the real benefit that you're testifying for reducing the amount of time that you will be in prison?

A: I certainly don't want to go to prison. . . .

Q: Is there anything you wouldn't do for your daughter?

A: Under these conditions, I wouldn't lie for her.

Q: You wouldn't lie for your daughter?

A: I wouldn't lie and break my plea agreement that I had signed with the government.  My understanding is my plea agreement would go away if I lied, so I wouldn't lie for my daughter under those conditions.

In December, 2017, Flaherty again testified as a witness for the government, this time in Withrow's trial. The cross-examination of Flaherty by Withrow's counsel, Robert Goldstein, included the following colloquy about the adoption:

Q: [L]et me ask you this: After your cooperation, Mr. Flaherty, after April of 2012, did you engage or did you defraud or deceive anyone after April of 2012?

A: Not that I can remember, no.

Q: Not that you can remember?

A: I don't believe I did.

Q: Okay. You adopted your daughter in - after you began cooperating, right?

A: Correct.

. . .

Q: My question is that when you adopted her you met the biological parents, right?

A: Correct, yup.

Q: The father told you that . . . they couldn't afford another child and for you to take good care of his daughter, right?

A: Yes

-6-

Q: You didn't tell that father that you were facing a five-year sentence in jail and that you had pled guilty to federal crimes?

. . .

A: Okay. So I guess I didn't tell him that I was going – that I had signed a plea agreement, that I was cooperating with the government, no.

. . .

Q: And this conversation was captured -- you talking about this was captured in a recording with the FBI, right?

A: I don't remember.

. . .

Q: Mr. Flaherty, agents were listening to your phone calls, right?

A: Yes.

Q: Do you remember you spoke with Mr. Babini and you told him that story?

A: I don't remember.

. . .

Q: Mr. Flaherty, you didn't tell the biological father you were facing five years in prison, right?

A: No.

Q: And the FBI knew that you adopted a girl, right?

A: I told them, yes.

### 2.   Tax Returns

On May 1, 2016, on the eve of Weed's trial, counsel for Flaherty informed the government that Flaherty had initially filed inaccurate tax returns for tax years 2010 and 2011.  In an

email and letter sent immediately thereafter, the government disclosed the following to defense counsel:

> Coleman Flaherty did not file accurate tax returns related to income he made during the period of the alleged conspiracy. On advice of counsel, Mr. Flaherty subsequently filed amended tax returns for 2010 and 2011.

The government did not attach any additional documentation, such as copies of the amended tax returns themselves, to the letter. The government indicates that Flaherty did not provide such supporting documentation to them.

Weed's counsel, Mr. Carney, upon receiving that information, did not ask the Court for a continuance in order to subpoena Flaherty's tax returns or otherwise investigate the possibility that Flaherty committed tax fraud during his cooperation. The parties instead proceeded to trial. At no point during the trial did Weed's counsel question Flaherty about his tax returns.

On May 3, 2016, two days into Weed's trial (and three days before Flaherty was scheduled to testify), the government received a draft version of Flaherty's Presentence Report ("PSR") prepared by the U.S. Probation Office. The PSR contained a note that the Probation Office had been "unable to locate" Flaherty's federal tax returns for the 2012 and 2013 tax years.

-8-

Withrow's counsel opted to subpoena Flaherty's tax returns and cross-examined him on his failure to file and the discrepancies between the returns he did file and what he actually earned while cooperating with the FBI:

> Q: The plea agreement requires that you not commit any crimes during the period of your cooperation, right?
>
> A: Yes.
>
> Q: And, as [the prosecutor] said, . . . if you were to commit any crimes, what would happen? You said you'd lose the benefit of your agreement, right?
>
> A: Yes.
>
> Q: The fact of the matter is that you filed false tax returns, right?
>
> A: No.
>
> . . .
>
> Q: Did your lawyer tell the government that you filed false tax returns?
>
> . . .
>
> A: I had talked with my accountant recently when you had subpoenaed my tax returns, and I was under the impression that we did amend the 2011 taxes from years back. After I agreed to plead guilty with the government, I went to see my accountant at the suggestion of my attorney, and I – we had talked about amending my 2010 and 2011 taxes. We amended 2010. I also believed that we had amended 2011. I thought we did, up until recently where he had told me that we didn't amend 2011; we just amended 2010. But I believed 2010 was the year when my criminal conduct happened where the money was made. So I amended 2010 and straightened that out; and to the best of my knowledge, 2010 and 2011 are taken care of.
>
> Q: So the question is: Your 2010 return was false?

-9-

A: When I initially filed it?

Q: Yes.

A: Yes, and then I amended it.

Q: Right. But you swore under oath in a return to the IRS, and you concealed your illegal income, right?

A: Yes, and then I amended it.

**B.    Procedural History**

In May, 2016, a jury found Weed guilty on all counts. He was sentenced to a term of imprisonment of 48 months on each count to run concurrently, followed by three years of supervised release, plus a fine of $100,000, a special assessment of $900, forfeiture and restitution.

In October, 2016, United States District Judge Douglas P. Woodlock allowed petitioner's motion for a stay of his surrender date and release pending his appeal to the First Circuit. Weed argued on appeal, inter alia, that the evidence was insufficient to support his conviction and relied upon a novel interpretation of Section 3(a)(9) of the Securities Act. In October, 2017, the First Circuit affirmed Weed's conviction. Weed, 873 F.3d at 70. He subsequently petitioned for a writ of certiorari to the United States Supreme Court, which was denied.

In February, 2018, Weed filed a motion to compel the production of what he claimed was "exculpatory evidence." He also sought another stay of his surrender date. Weed alleged

-10-

that the government did not hand over material impeachment evidence related to Flaherty. The Court allowed petitioner's motion to stay his surrender date but informed him that a motion to compel was not the proper vehicle through which to raise his claims. The Court instead directed defendant to file a motion to vacate under 28 U.S.C. § 2255, which petitioner did.

In December, 2024, the case was transferred to this session of the Court.

## II.  Discussion

### A.  Legal Standard

Section 2255 enables a prisoner in custody to move the court that imposed his sentence to vacate, set aside or correct the sentence if it 1) was imposed in violation of the Constitution or laws of the United States or by a court that lacked jurisdiction, 2) was in excess of the maximum authorized by law or 3) is otherwise subject to collateral attack. 28 U.S.C. § 2255(a); David v. United States, 134 F.3d 470, 474 (1st Cir. 1998). The petitioner bears the burden of establishing the need for relief in each of those circumstances. David, 134 F.3d at 474. To be entitled to relief under §2255, the petitioner must present "exceptional circumstances" that make the need for redress "evident." Id. (citing Hill v. United States, 368 U.S. 424, 428 (1962)).

-11-

To establish a Brady violation, a habeas petitioner must demonstrate

> 1)    the evidence at issue is favorable to him because
>
> 2)    it is exculpatory or impeaching;
>
> 3)    the Government suppressed the evidence; and
>
> 4)    prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment).

Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005).

Prevailing on a claim of ineffective assistance of counsel under the Sixth Amendment to the U.S. Constitution may provide a basis for habeas relief. Prou v. United States, 199 F.3d 37, 47 (1st Cir. 1999). Ineffective assistance of counsel requires a petitioner to demonstrate that 1) his representation by counsel fell below an objective standard of professionalism and 2) he was prejudiced by his counsel's substandard conduct. Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). The Strickland test is formidable:

> [J]udicial scrutiny of counsel's performance must be highly deferential [and] counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Id. at 689-90; see also Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (noting that petitioner must show that his "counsel's

-12-

choice was so patently unreasonable that no competent attorney
would have made it") (internal citation omitted).

### B.   Application

Petitioner contends that this Court must grant him a new
trial because he was materially prejudiced by two distinct
constitutional violations: 1) the government's failure to
disclose impeachment evidence of a key witness under Brady and
Giglio and 2) his trial counsel's failure to provide him
effective counsel, including, inter alia, by not requesting from
the government the undisclosed impeachment evidence.

Petitioner, in his motion, appears to focus on three pieces
of evidence as the source of the misconduct of both the
government and his counsel: 1) the Flaherty-Babini call
discussing Flaherty's prior conversation with his child's
biological father, 2) the draft PSR notation that the Probation
Office was unable to locate Flaherty's 2012 and 2013 tax
returns, and 3) Flaherty's tax return information, which would
have shown that it was either inaccurate or that a return was
not filed at all.  The Court assesses each piece of evidence
seriatim.[1]

---

[1] While the element of materiality must be evaluated "collectively, not item
by item," Kyles v. Whitley, 514 U.S. 419, 437 (1995), whether the government
suppressed some but not all of purportedly material evidence will be
addressed independently.

### 1. **Brady** / **Giglio** Claims

#### i.   **Favorability of the Evidence**

Evidence is "favorable" to a defendant if it "may make the difference" in the outcome of the trial if "used effectively." United States v. Bagley, 473 U.S. 667, 676 (1985).

The evidence relating to Flaherty's taxes is undoubtedly favorable to petitioner because it provides yet another instance with which to attack Flaherty's credibility. See Arizona v. Youngblood, 434 U.S. 497, 511 n.30 (noting that it is a "well-accepted proposition that a witness may be impeached with evidence tending to show that he has an interest in giving testimony favorable to the State and against the defendant").

The same cannot be said for the Flaherty-Babini call.  By all accounts, it was an unremarkable conversation between Flaherty and a co-conspirator in a separate criminal case about personal matters unrelated to securities fraud.

Granted, Withrow's counsel demonstrated effective use of the call by posing questions in the negative about what Flaherty did not disclose (e.g., "You didn't tell [the biological father] that you were facing a five-year sentence in jail and that you had pled guilty to federal crimes?").  But this Court does not fault the government for failing to foresee the potential cross-

-14-

examination value of what appears to be an innocuous telephone conversation between Flaherty and a co-defendant in a separate prosecution.

Certainly, courts have construed <u>Brady</u> obligations broadly to encourage prosecutors to err on the side of disclosure even if the materiality of the evidence is unclear. <u>Kyles</u> v. <u>Whitely</u>, 514 U.S. 419, 435 (1995) (citing <u>Agurs</u>, 427 U.S. at 108). The value of such evidence here is not, however, just unclear, it is opaque. What the government's witness told a co-defendant about a conversation the witness had one year earlier with the biological father of his adopted daughter is of little impeachment value. Its favorability is doubtful.

### ii.  **Suppression**

Under <u>Brady</u>, the government is obliged to produce material information in its possession, custody or control. <u>United States</u> v. <u>Hall</u>, 434 F.3d 42, 55 (1st Cir. 2006).[2] At the same time, <u>Brady</u> does not obligate the government to conduct an investigation on behalf of the defense. <u>Huenfeld</u> v. <u>Maloney</u>, 62 F. Supp. 2d 211, 222 (citing <u>United States</u> v. <u>Hawkins</u>, 78 F.3d 348, 351 (8th Cir. 1996)).

---

[2] The government's obligation applies both to information in its actual possession and its "constructive possession," <u>United States</u> v. <u>LaRoche Campaign</u>, 695 F. Supp. 1290, 1295 (D. Mass. 1988), meaning that it includes information over which it "exercises dominion or control." <u>Aybar-Alejo</u> v. <u>INS</u>, 230 F.3d 487, 488 (1st Cir. 2000).

Both the PSR and the Flaherty-Babini recording were within the prosecutors' actual possession. Flaherty's tax returns and financial information, on the other hand, were not.

Tax return information is not "readily available" to the government in the same way as run-of-the-mill criminal records. Although it is generally true that the government "is not a congery of independent hermetically sealed compartments," Osorio, 929 F.2d at 760, the IRS stands as an important exception. Section 6103 of the Internal Revenue Code not only prohibits the IRS from disclosing tax returns and return information to the general public but it also prohibits such disclosure to other government agencies. See Lehrfeld v. Richardson, 132 F.3d 1463, 1463-64 (D.C. Cir. 1998); CFTC v. Collins, 997 F.2d 1230, 1233 (7th Cir. 1993). Section 6103 was, in fact, intentionally designed to "hermetically seal" tax return information in all but the rarest of circumstances. As the First Circuit explained,

> In the tax statute, . . . Congress has decided that, with respect to tax returns, confidentiality, not sunlight, is the proper aim. Tax returns contain highly personal information that many taxpayers might not wish to broadcast. Moreover, without clear taxpayer understanding that the government takes the strongest precautions to keep tax information confidential, taxpayers' confidence in the federal tax system might erode, with harmful consequences for a tax system that depends heavily on voluntary compliance.

-16-

Aronson v. I.R.S., 973 F.2d 962, 966 (1st Cir. 1992) (citing

Church of Scientology v. I.R.S., 792 F.2d 153, 158-59 (D.C. Cir.

1986)(en banc), aff'd 484 U.S. 9 (1987)).

None of the cases cited by petitioner suggests that the

government must conduct a tax audit of any potential cooperator.

Perdomo, Auten, Young, and Carriger all concern the government's

obligation to conduct routine background checks, an obligation

that the government in this case fulfilled.

Weed relies on the First Circuit decision in Osorio to

contend that, regardless of whether the government knew of

Flaherty's tax fraud, it should have suspected as much and

conducted an investigation. The First Circuit, however, later

clarified its holding in Osorio to preclude precisely the kind

of claims petitioner pursues:

> Neither the relevant Supreme Court precedent under Brady
> nor our decision in Osorio requires a prosecutor to seek
> out and disclose exculpatory or impeaching information not
> in the government's possession.  To comply with Brady the
> individual prosecutor has a duty to find any evidence
> favorable to the defendant that was known to those acting
> on the government's behalf. . . . Such persons include
> other members of the prosecuting team, including police
> investigators working for the prosecution.

United States v. Bender, 304 F.3d 161, 164 (1st Cir. 2002)

(citing Strickler v. Greene, 527 U.S. 263, 280 (1999); Kyles v.

Whitley, 514 U.S. 419, 437 (1995)).

-17-

The Internal Revenue Service ("IRS") was not a party to this investigation or prosecution and does not constitute "the government" for the purpose of a Brady analysis. See United States v. Hall, 434 F.3d 42, 55 (1st Cir. 2006) (Brady obligations "do[] not extend to information possessed by government agents not working with the prosecution.").

If this Court were to endorse Weed's proposition, it would impose a duty on the government to examine all of the files of every federal government agency to ascertain whether any cooperating witness may have committed wrongdoing previously unknown to the prosecution.    The Court declines to interpret Brady and its progeny as imposing such an onerous obligation.

### iii.    Materiality

At the end of the day, petitioner must show that he was prejudiced by the government's failure to turn over the purportedly favorable evidence in its possession. Fundamentally, the question is whether the impeachment information was material, meaning that

> a reasonable probability [exists] that the result of the trial would have been different if the suppressed evidence had been disclosed.

United States v. Paladin, 748 F.3d 438, 444 (1st Cir. 2014) (quoting Conley, 415 F.3d at 188)(internal quotations omitted). This does not require proof that petitioner would have been

-18-

acquitted, but merely that "the likelihood of a different result is great enough to undermine[] confidence in the outcome of the trial." Paladin, 748 F.3d at 444 (quoting Smith v. Cain, 565 U.S. 73, 75-76 (2012)).

Impeachment evidence may be material even though a witness has already been impeached with other evidence. Turner v. United States, 582 U.S. 313, 327 (2017) (citing Wearry v. Cain, 577 U.S. 385, 3394 (2016)(per curiam)). However, impeachment evidence is

> less likely to be considered material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already shown to be questionable.

United States v. Spinelli, 551 F.3d 159, 165 (2d Cir. 2008)(internal quotations omitted); see also Turner, 582 U.S. at 327-28 (assessing whether "in the context of this trial, with respect to th[is] witness[], the cumulative effect of the withheld evidence is insufficient to undermine confidence in the jury's verdict").

Defense counsel at the Weed trial pulled no punches in his cross-examination of Mr. Flaherty, which, as Judge Woodlock described, was "devastating." The entire purpose of Mr. Carney's cross-examination was to hammer home to the jury that Mr. Flaherty was a serial liar with a track record of successfully conning people to whom he had repeatedly lied.

Flaherty was impeached several times over on a variety of topics, including 1) whether he voluntarily paid back money he owed to a former employer, 2) the reasons for his termination from prior firms and 3) whether he identified someone as his attorney in his first interview with FBI agents.  Defense counsel highlighted how Flaherty, on multiple occasions, made and subsequently broke his promises to uphold ethical and legal obligations to his clients in his role as a stockbroker.  Mr. Carney questioned him about engaging in unauthorized trades for his clients and being questioned by FINRA about potentially "churning" clients' accounts.

Attorney Carney also emphasized that but but for his cooperation, Flaherty faced five to six years in prison (according to his sentencing guideline calculation), and that he was hoping that his cooperation would result in a probationary sentence.  Counsel emphasized that Flaherty's plea agreement was contingent not on general cooperation but on specific cooperation in the case against Weed, suggesting that Flaherty was motivated to implicate Weed by the structure of his agreement with the government.

In many ways, Flaherty helped the defense attack his own credibility.  He was an obstructive witness, frequently evasive

-20-

in his answers and he was warned on multiple occasions by Judge
Woodlock that he risked being held in contempt of court.

By the time Flaherty was excused, the jury knew he was
guilty, many times over, of securities and wire fraud.  He had
engaged in a prolific "pump and dump" scheme across many
companies, so much so that he described it as his "business
model."  He was known to have lied on numerous occasions, even
to those who trusted him most.  Even on the stand and under
oath, his ability to give straight answers to simple questions
was suspect.  Finally, and most importantly, he had a meaningful
incentive to provide favorable testimony for the government: the
impending threat of his sentencing set for shortly after trial.

The Court therefore finds that the inability of the
Probation Office to locate Flaherty's tax returns was not
material when "evaluated in the context of the entire record."
Agurs, 427 U.S. at 112.  The PSR notation, standing alone, was
not strong evidence of tax fraud (let alone tax crimes to which
the government was willfully blind in exchange for Flaherty's
testimony).  The matters on which the PSR may have assisted
impeachment was collateral to the central issues in Weed's case.
Furthermore, Flaherty's credibility had already been devastated
by defense counsel.

-21-

In sum: this Court finds that the government has not violated its obligation under Brady or Giglio in this case because none of the evidence which petitioner insists he was owed satisfies all elements of Brady. The evidence in question was not 1) favorable to the defense (the Flaherty-Babini call), 2) in the possession of the government and thus capable of suppression (Flaherty's tax return information) or 3) material to a finding of guilt (the draft PSR noting Flaherty's missing 2012 and 2013 tax returns).

### 2. Ineffective Assistance of Counsel

Just as in the Osorio case, petitioner seeks to place blame on both the government and his trial counsel for failing to investigate further Flaherty's potential tax fraud and adoption deception.

Weed's trial counsel, upon receiving the government's last-minute disclosure that Flaherty had filed, and then corrected, inaccurate tax returns for two tax years, did not utilize that information to impeach Flaherty. Nor did he request a continuance of the trial to subpoena Flaherty's tax records or question Flaherty about his failure to disclose his prospects for imprisonment during the adoption process for his daughter.

Petitioner's ineffective assistance of counsel claims fail for the same reason as his Brady claim: the evidence at issue

was immaterial. See Ferrara v. United States, 384 F. Supp. 2d
384, 413 (D. Mass. 2005) ("Since at least 1984, the Supreme
Court has treated the 'materiality' requirement for Brady v.
Maryland claims and the 'prejudice' requirement for ineffective
assistance of counsel claims as synonymous.") (citing Hill v.
Lockhart, 474 U.S. 52, 57 (1985)). The Court will not reiterate
its reasoning, except to repeat that Flaherty's credibility had
been so thoroughly subverted that additional testimony about his
tax filings or his lack of candor during the adoption
proceedings would add only marginal emphasis to the cross
examination, certainly not enough to undermine the jury verdict.

   In any event, trial counsel's conduct did not fall below an
objective standard of competence necessary to trigger a Sixth
Amendment violation. Decisions on how to structure a defense,
including whether to cross-examine a witness on specific topics,
are generally strategic in nature and thus entitled to a
presumption of reasonableness. United States v. Soto-Alvarez,
958 F.2d 573, 479 (1st Cir. 1992); see also Michel v. Louisiana,
350 U.S. 91, 101 (1955) (actions or omissions by counsel that
might be considered sound trial strategy do not constitute
ineffective assistance). Counsel need not attack the
credibility of an adverse witness on every possible front to
render effective assistance. See Stephens v. Hall, 294 F.3d

-23-

210, 225-26 (1st Cir. 2002) (holding that failure to impeach a witness with his criminal record does not prejudice defendant where alternative methods of cross-examination were employed).

Petitioner cannot overcome that presumption simply by comparing the strategy of his counsel to that of Withrow's counsel.  While the difference may frustrate petitioner, it does not constitute a Sixth Amendment violation by his counsel.  The analysis under Strickland requires a comparison of his counsel's conduct to the "wide range of reasonable professional assistance" that an attorney may provide sufficient to render effective assistance. Rossetti v. United States, 773 F.3d 322, 327 (1st Cir. 2014).  It is not a comparative exercise between two specific cross-examinations of the same witness.

The remainder of Weed's claim of ineffective assistance of counsel simply raises two alleged deficiencies which have been rejected on appeal.  Specifically, Weed refers to trial counsel's failure 1) to raise the Section 3(a)(9) exemption and 2) to object to the district judge's constructive amendment of the indictment in his instructions to the jury at trial.

On appeal to the First Circuit, the parties disputed whether Weed's trial counsel had preserved the Section 3(a)(9) issue for appeal.  The Court did not rule on the question but applied the more generous standard of review as if defense

-24-

counsel had successfully preserved the issue for appeal.    Thus, his counsel's failure to object had no effect on defendant's appeal.    Furthermore, this Court has already declared that petitioner's interpretation of Section 3(a)(9) "is not the law." SEC v. Weed, 14-cv-14099-NMG, Docket No. 107.

With respect to the so-called constructive amendment of the indictment, the First Circuit already rejected petitioner's claim by holding that it was "confident that the court's instructions accurately conveyed the elements of securities fraud." Weed, 873 F.3d at 75.    While in some cases, counsel's failure to raise a single objection at trial may constitute ineffective assistance, the objection must be "so obvious and promising that no competent lawyer could have failed to pursue it." Arroyo v. United States, 195 F.3d 54, 55 (1999).    That is not the case here.    The First Circuit held that there was no error in the jury instructions, let alone an error so obvious that no competent attorney would miss it.

Petitioner does not therefore state a viable claim of ineffective assistance of counsel.

### 3. Motion for Discovery

A habeas corpus petitioner is not automatically entitled to discovery. Bracy v. Gramley, 520 U.S. 899, 904 (1997); see also

-25-

Huenefeld v. Maloney, 62 F. Supp. 2d 211, 235 (D. Mass. 1999).

The Court may order such discovery only where

> specific allegations before the court show reason to
> believe that the petitioner may, if the facts are fully
> developed, be able to demonstrate that he is . . . entitled
> to relief . . . .

Bracy, 520 U.S. at 908-09 (quoting Harris v. Nelson, 394 U.S.

286, 300 (1969)).

In order to determine whether petitioner is entitled to

discovery under Rule 6(a) of the Rules Governing Section 2255

Proceedings, this Court must first identify the "essential

elements" of his claims. Bracy, 520 U.S. at 904, 117 (citing

United States v. Armstrong, 517 U.S. 456, 468 (1996)).  Then the

court must determine whether petitioner's allegations establish

"good cause" to necessitate discovery to prove the elements of

his claims. See id., 520 U.S. at 905-06.

This Court has previously determined that, based on the

information presented in the petition, Weed does not have a

valid Brady or Strickland claim.  The only remaining question is

whether he has demonstrated that additional discovery might

change the Court's calculus.

Petitioner asserts that he is deserving of discovery

because it would

reveal the full extent of the government's failings and whether it was the result of intentional suppression, willful blindness, or mere negligence.

This does not constitute good cause because the government's intent is not dispositive of the question of a Brady violation, i.e., the government fails to uphold its obligation regardless of whether the suppression of evidence was willful or inadvertent. Arizona v. Youngblood, 488 U.S. 51, 57 (1988); United States v. Therrien, 847 F.3d 9, 16 (1st Cir. 2017).

Furthermore, petitioner avers that one of the government's derogations of duty was its failure to "investigate and uncover" impeachable information about Flaherty that the government either knew or should have known. That too fails to allege a Brady or Giglio violation because, as previously stated, the law does not impose an obligation on the government to create exculpatory information where there is none. Alverio-Melendez, 640 F.3d at 424; see also United States v. Maldonado-Rivera, 489 F.3d 60, 67 (1st Cir. 2007).

Petitioner relies on Osorio for the proposition that

> [a]n Assistant United States Attorney using a witness with an impeachable past has a constitutionally derived duty to search for and produce impeachment information requested regarding the witness.

929 F.2d 753, 761 (1st Cir. 1991). Again, Osorio is readily distinguishable because the impeachable information (i.e., that

-27-

the prosecution's chief witness was a prolific drug dealer) was known by colleagues in the prosecutor's own office. Id. at 756. The First Circuit in Osorio did not extend the duty to investigate to information held within federal agencies not involved in the prosecution of the case. Hall, 434 F.3d at 55.

Petitioner is not entitled to discovery in this case.

### ORDER

For the foregoing reasons,

- petitioner's motion to vacate his sentence pursuant to 28 U.S.C. § 2255 (Docket No. 251) is **DENIED**; and

- petitioner's motion for discovery (Docket No. 254) is **DENIED**.

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated:  March 31, 2025